**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

LISA MARIE ALKANA,                         ) Case No. CV 17-5743-JPR
                                           )
                        Plaintiff,         )
                                           ) **MEMORANDUM DECISION AND ORDER**
              v.                           ) **AFFIRMING COMMISSIONER**
                                           )
NANCY A. BERRYHILL, Acting                 )
Commissioner of Social                     )
Security,                                  )
                                           )
                        Defendant.         )
                                           )

**I.    PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision
denying her application for Social Security disability insurance
benefits ("DIB").  The parties consented to the jurisdiction of
the undersigned under 28 U.S.C. § 636(c).  The matter is before
the Court on the parties' Joint Stipulation, filed April 10,
2018, which the Court has taken under submission without oral
argument.  For the reasons stated below, the Commissioner's
decision is affirmed.

**II.  BACKGROUND**

Plaintiff was born in 1984.  (Administrative Record ("AR") 183.)  She completed 12th grade (AR 53) and worked as a receptionist (AR 201).

In August 2013, Plaintiff applied for DIB, alleging that she had been unable to work since February 1, 2012, because of "multiple sclerosis, confusion, fatigue, numbness of legs, facial numbness, [and] off and on blindness of one eye."  (AR 91, 183.) After her application was denied (AR 87, 97), she requested a hearing before an Administrative Law Judge (AR 100).  An initial hearing was held on June 10, 2015, at which the ALJ ordered consultative examinations.  (See AR 78-86.)  A second hearing was held on March 16, 2016, at which Plaintiff, who was represented by counsel, testified.  (AR 38, 47-77.)  In a written decision issued March 29, 2016, the ALJ found Plaintiff not disabled.  (AR 22-37.)  Plaintiff requested Appeals Council review, which was denied on May 8, 2017.  (AR 2-7, 181.)  This action followed.

**III.  STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance.

2

Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of

3

impairments significantly limiting her ability to do basic work activities; if not, the claimant is not disabled and her claim must be denied.  § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed.  § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform her past work; if so, she is not disabled and the claim must be denied.  § 404.1520(a)(4)(iv).  The claimant has the burden of proving she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v); Drouin, 966 F.2d at 1257.  That

---

[1] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  The Commissioner assesses the claimant's RFC between steps three and four.  Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

4

determination comprises the fifth and final step in the sequential analysis. § 404.1520(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.   <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (AR 25.)  At step two, he concluded that Plaintiff had a severe impairment of multiple sclerosis. (<u>Id.</u>)  At step three, he determined that Plaintiff's impairment did not meet or equal a listing. (AR 27.)  At step four, the ALJ found that Plaintiff had the RFC to perform sedentary to light work; specifically, she could

> lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for two hours in an eight-hour workday, and sit for eight[ ]hours in an eight-hour workday, while having the option to alternate between sitting, standing, and walking every two hours. [She] must also avoid unprotected heights, dangerous moving machinery, and exposure to extreme cold.

(AR 28.)  The ALJ concluded that Plaintiff could perform her past relevant work as a receptionist. (AR 32.)  Accordingly, he found her not disabled. (<u>Id.</u>)

**V.   DISCUSSION**[2]

Plaintiff claims that the ALJ erred in discounting her testimony concerning her fatigue. (J. Stip. at 4-9, 18-21.)  But as discussed below, the ALJ did not err and remand is not warranted.

A.   Applicable Law

An ALJ's assessment of a claimant's allegations concerning the severity of her symptoms is entitled to "great weight."  See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment

---

[2] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme Court recently held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause.  To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during her administrative proceedings. (See AR 47-77, 181; J. Stip. at 4-9, 18-21); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council).

[that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

B.  Relevant Background

    1.  Doctors' records

Plaintiff's primary-care physician referred her to neurologist Richard Shubin in 2008.  (See AR 338.)  A November 2011 MRI indicated that she had "[p]ossible demyelinating disease."  (AR 295.)  She was ultimately diagnosed with relapsing remitting MS.  (See AR 338.)

Plaintiff visited an internist in October 2012, stating that she felt "ok[ay]."  (AR 277-78.)  She complained to Dr. Shubin of fatigue in February and March 2013.  (AR 286-87.)  In March 2013, Dr. Shubin diagnosed her as "temporarily disabled . . . because of fatigue."[3]  (AR 286.)  In April 2013, her fatigue "ha[d] not improved" (AR 285); she was prescribed amantadine[4] in the amount of "100 mg daily for seven days then 100 mg twice a day for treatment of fatigue" (id.; see also AR 283).  In May 2013, Plaintiff reported no fatigue, and she was not taking naps during the day.  (AR 284.)  In August 2013, Plaintiff stated that she had "not taken [amantadine]" despite her prescription for it and complained of "persistent fatigue interfering with daily function."  (AR 280-81.)  She also "ha[d] to rest frequently and

---

[3] The ALJ gave "little weight" to this and other of Dr. Shubin's opinions (AR 30), findings Plaintiff has not challenged on appeal.

[4] Amantadine is commonly prescribed to treat fatigue in MS patients.  See The Effect of Amantadine for the Treatment of Fatigue in People with Multiple Sclerosis, PubMed Health, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0011611/ (last visited July 18, 2018).  Amantadine's designated use is treating the flu and Parkinson's disease.  See Amantadine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682064.html (last updated May 15, 2018).

8

ha[d] difficulty taking care of her child without help." (AR
280.) She again "agree[d] to try [amantadine]." (AR 281.) In
February 2014 she "complain[ed] of feeling excessively tired most
of the time." (AR 310.)

Plaintiff became pregnant around early March 2014. (See AR
326.) In August 2014, she reported that she had "some headaches
with this pregnancy" but did "not find that they [were] so severe
that she need[ed] any other medication." (Id.) She also
reported fatigue. (Id.) She gave birth to her second child in
December 2014. (AR 327.) In March 2015, she again reported
fatigue but "denie[d] any neck pain or headache." (Id.) In
April 2015, she reported problems with "memory, focus, and
concentration," which had "not improved even though she [was]
sleeping better at night since her newborn [was] now sleeping
through the night." (AR 328.) In May 2015, Dr. Shubin's
registered nurse practitioner observed "[o]ngoing fatigue." (AR
329.) She recorded that Plaintiff had been "prescribed
amantadine for fatigue, but was not able to tolerate it," and
prescribed instead a "[t]rial of Ritalin 5 mg one-half to one
full tablet daily for fatigue."[5] (AR 329.) In June 2015,
Plaintiff reported that she was "reluctant to start it and ha[d]
not tried" it. (AR 330.) Her EEG that same day was "normal."
(AR 336.)

_____

[5] Ritalin is a brand of methylphenidate used to treat
attention deficit hyperactive disorder and narcolepsy.
Methylphenidate, MedlinePlus, https://medlineplus.gov/druginfo/
meds/a682188.html (last updated Sept. 15, 2017). It is sometimes
prescribed to treat fatigue in MS patients. See Fatigue,
Multiple Sclerosis Ass'n of Am., https://mymsaa.org/
ms-information/symptoms/fatigue/ (last updated May 22, 2018).

Around April 2015, Dr. Shubin recommended that Plaintiff see neuropsychologist Holly Edge-Booth because of her "neurocognitive decline," decreased "memory" functioning, and "worsening fatigue." (See AR 338.) Dr. Edge-Booth noted that month that Plaintiff "remain[ed] fully independent with respect to all activities of daily living." (Id.) She found that "although [Plaintiff] admitted being tired and yawned frequently [she] tolerated a full day's assessment and completed all planned measures." (AR 339.) She ultimately recommended that Plaintiff "seek individual neuropsychological therapies." (AR 344.)

Plaintiff was examined in July 2015 by two state-agency physicians, clinical psychologist Badri Moghadam and neurologist Sarah L. Maze. (AR 349-55.) Dr. Moghadam reported that Plaintiff was confused as to the time and date of her appointment. (AR 349.) But she described her as "oriented" and noted that she "followed the instructions and was on task." (Id.) Plaintiff claimed that she couldn't manage money because her "memory [was] not that good." (Id.) Dr. Moghadam found that she "function[ed] at the low average range on all the areas of cognitive ability" except one, as to which she was average; she could "talk, walk, read, write, cook, drive, and communicate." (AR 351.) She completed Dr. Moghadam's testing without making any mistakes, although her speed was below average. (Id.)

Dr. Moghadam saw Plaintiff again in August 2015. (AR 362.) At that evaluation, she observed that Plaintiff "was pleasant, attentive[,] and very well behaved" but "looked very tired doing the task" and "got tired and could not keep up." (Id.) When Plaintiff was "getting too nervous and exhausted[,] [she] stopped

10

her." (AR 363.) She concluded that "the results of [the] evaluation show[ed] that [Plaintiff was] doing poorly" and that the "[t]est result indicate[d] that there [was] a problem with brain function." (AR 364.)

Dr. Maze reviewed two MRIs from November 2011, a report from Dr. Shubin, a March 2015 brain MRI, and a psychological assessment. (AR 352.) Plaintiff complained of "headache[s] which occur[red] about once or twice per week" but stated that "[s]he d[id] not take any particular medications for headache[s]." (AR 353.) She also said she was "forgetful." (Id.) She "handle[d] personal grooming, cook[ed], shop[ped], visit[ed] friends, and watche[d] television." (Id.) She also "care[d] for her children," with help from "[h]er mother and mother-in-law." (Id.) Dr. Maze found that her "[a]ttention and concentration [were] not impaired." (Id.) She observed that Plaintiff "st[ood] and walk[ed] unaided in a very stable manner." (AR 354.) Dr. Maze concluded that Plaintiff could "occasionally lift 20 pounds and frequently lift 10 pounds" (id.), "stand and walk two hours of an 8-hour workday" (AR 355), and "sit six hours of an 8-hour workday" (id.). She had no limitations in performing typical daily activities. (See AR 361.)

### 2. Plaintiff's statements

In her initial disability report, completed in September 2013 (see AR 193), Plaintiff reported that she was taking amantadine for fatigue (AR 197). On her pain-and-other-symptoms form, completed in October 2013 (AR 218-19), she reported that the amantadine caused her "headache[s]" (AR 219). She also noted that she napped "[t]wice or more a day" for "2-3 hours or more."

11

(AR 218.)[6]  On her adult function report, completed the same day
(AR 220-27), she wrote that she did "chores" and "g[o]t ready"
but did it all "slowly" (see AR 220).  She cared for her
daughter, but her "husband" and "[s]ometimes [her] mother" helped
her.  (AR 221.)  She reported that she cooked "meals that [we]re
easy to prepare."  (AR 222.)  She also said that she could go out
alone but it "depend[ed on] how exhausted" she was.  (AR 223.)
She still engaged in hobbies, including "reading, watching TV,
scrapbooking, [and] teaching [her] daughter"; she "like[d] doing
things that [we]re simple [and] easy physically."  (AR 224.)  She
noted that she had to take "a few breaks" while engaged in her
hobbies.  (Id.)  She also drove.  (AR 223.)  She reported no
change in her "cooking habits" or "social activities" since the
onset of her fatigue.  (AR 222, 225.)  She could follow
instructions for five to 10 minutes, sit for "30-45 min[utes],"
stand a "max[imum of] 20 min[utes]," and walk 10 to 15 minutes.
(AR 225.)  She could pay attention for an "hour" at a time but
couldn't "finish what [she] start[ed]" without "breaks."  (Id.)
In a disability report created sometime between September 2013
and February 2014 (see AR 233), she reported that amantadine
caused her "major headaches" (AR 234).

     At her hearing in March 2016, when asked if she "primarily"
cared for her one-year-old, she stated that her "mom" did.  (AR
57.)  When later asked why, she said it was because she was
"tired" and that "[s]ome days [she could]n't get out of bed."

_____

     [6] Just a few months earlier, she had told Dr. Shubin that
she did not nap during the day.  (AR 284.)  Indeed, she reported
"f[all]ing asleep quickly" and sleeping 10 hours a night.  (Id.)

(AR 67.)  She acknowledged, however, that the child was "under [her] exclusive care and control" during its first three months. (AR 57.)  When asked what happened to her in February 2012 that prevented her from working, she blamed "[t]he fatigue," alleging that "[i]t was hard for [her] to get out of bed" (AR 63), though she later admitted she was actually "laid off" (AR 71).  She acknowledged that she could perform many tasks on her own, including washing, bathing, and dressing.  (AR 66.)  She admitted that she had driven the day before the hearing.  (AR 54.)  She would "try" to prepare meals but would "forget" as she went along and would "get really tired" and "frustrated."  (AR 66.)  She claimed that on days she felt fatigue, it lasted "[a]ll day." (AR 67.)  On those days, she would "have to lay down" and "stay in bed"; "[s]ome days" she couldn't "get out of bed."  (Id.; see also AR 69.)  She claimed that happened "[f]our to five days" a week.  (AR 68.)  On "good days," she would "brush [her] teeth," dress, and "try to take care of [her] kids."  (Id.)  But even then it was "still a struggle."  (AR 69.)  She reported yearly MRIs as her only planned future treatment.  (AR 72.)  She asserted that she couldn't continue her past work because of her "memory," stating that it was "hard for [her] to retain information" "because [she was] tired" and "[t]he fatigue g[ot] in the way of everything."  (AR 73-74.)   Her husband got frustrated with her because he had to tell her things "many times."  (AR 74-75.)

   C.  <u>Analysis</u>

   The ALJ cited Plaintiff's "activities of daily living," conduct "at the hearing," and "limited treatment history" when

13

discrediting her subjective symptom testimony.  (AR 31.)  He also
found that the "objective evidence" of record "d[id] not support
[her] allegations."  (<u>Id.</u>)  Contrary to Plaintiff's argument, the
ALJ's findings were sufficient to discount her subjective fatigue
testimony.

1.   <u>Objective medical evidence</u>

Contradiction with evidence in the medical record is a
"sufficient basis" for rejecting a claimant's subjective symptom
testimony.  <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155,
1161 (9th Cir. 2008); <u>see</u> <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>,
169 F.3d 595, 600 (9th Cir. 1999) (upholding "conflict between
[plaintiff's] testimony of subjective complaints and the
objective medical evidence in the record" as "specific and
substantial" reason undermining credibility).  Although a lack of
medical evidence "cannot form the sole basis for discounting
[symptom] testimony, it is a factor that the ALJ can consider in
his credibility analysis."  <u>Burch v. Barnhart</u>, 400 F.3d 676, 681
(9th Cir. 2005); <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th
Cir. 2001).  Here, the ALJ properly discounted Plaintiff's
testimony by considering its inconsistency with the medical
record.

Plaintiff claimed she could follow instructions for only
five to 10 minutes, sit for "30-45 min[utes]," stand a "max[imum
of] 20 min[utes]," and walk 10 to 15 minutes.  (AR 225.)  Yet Dr.
Edge-Booth found that "although she admitted being tired and
yawned frequently, [Plaintiff] tolerated a full day's assessment
and completed all planned measures."  (AR 339.)  She additionally
found that Plaintiff "remain[ed] fully independent with respect

14

to all activities of daily living." (AR 338.) Similarly, although "[h]er speed [was] below the average range," Plaintiff was able to complete the July 2015 testing with Dr. Moghadam, apparently without interruption and without making any mistakes. (AR 349-51.) Dr. Moghadam indicated in August 2015 that when Plaintiff was "getting too nervous and exhausted[,] [she] stopped her," and her overall performance "show[ed] that [Plaintiff] [was] doing poorly." (AR 363-64.) Yet Plaintiff could tolerate the testing with no need to take breaks to switch position or lie down. (See AR 362-64.)

Plaintiff claimed her fatigue also caused issues with concentration. (See J. Stip. at 4; see also AR 66 (she would "try" to prepare meals but would "forget"), 73-74 ("hard for [her] to retain information" "because [she was] tired"), 75 (fatigue made it "hard for [her] to focus on anything" she did), 225 (she could pay attention for only "hour" at a time).) Yet she was regularly described as "alert." (AR 286 (Mar. 2013), 315 (May 2013), 312 (Aug. 2013), 325 (Feb. 2014), 326 (Aug. 2014), 327 (Mar. 2015), 329 (May 2015), 330 (June 2015); see also AR 353 (July 2015: "[a]ttention and concentration [were] not impaired").) And in June 2015, her EEG was "normal," showing no impairment to brain activity. (AR 336.) Plaintiff herself did not circle "[m]emory" or "[c]oncentration" when indicating activities affected by her condition (see AR 225), and she admitted not needing reminders to take her medicine (AR 222).

Moreover, the ALJ "point[ed] out that no physician or psychologist support[ed Plaintiff's] allegations regarding mental limitations." (AR 26.) Dr. Edge-Booth, Plaintiff's own treating

doctor, evaluated her as "average" for "mental flexibility." (AR 341.) On several tests, she "showed a positive learning curve" and "retained all the information she had previously learned." (Id.) Dr. Edge-Booth also found that she "remain[ed] fully independent with respect to all activities of daily living." (AR 338.)

Dr. Maze's findings similarly contradicted Plaintiff's allegations. Though Plaintiff sometimes claimed she had trouble with concentration (see, e.g., AR 73-75, 225; but see AR 225 (Plaintiff not circling "[m]emory" or "[c]oncentration" in indicating things her illness affected)), Dr. Maze found that Plaintiff's "[a]ttention and concentration [were] not impaired" (AR 353). Plaintiff claimed she could stand for a "max[imum] of 20 min[utes]," walk 10 to 15 minutes, and sit for "30-45 min[utes]." (AR 225.) Yet Dr. Maze opined that Plaintiff could "stand and walk two hours of an 8-hour workday" and "sit six hours of an 8-hour workday." (AR 355.) She listed no additional fatigue-related limitations. (See AR 361.)

The ALJ also noted that the record "characteriz[ed]" Plaintiff's "multiple sclerosis as clinically stable on multiple occasions." (AR 31; see also AR 326 (Aug. 2014), 368 (Nov. 2015).) Similar findings also suggested her MS was well managed. (See AR 298 (May 2013: "multiple sclerosis, doing well" ), 280 (Aug. 2013: "[s]he state[d] the symptoms are stable"), 310 (Feb. 2014: "no exacerbations"), 327 (Mar. 2015: "intact" "[c]ranial

nerves," "[s]ensory," and "[c]oordination"; "negative" Romberg;[7]
and mostly normal "strength").)

Relatedly, the ALJ found that "[Plaintiff's] treatment and
examination history undermine[d] [her] allegations and
suggest[ed] that she [was] not as limited as she allege[d]." (AR
26.) The first recorded visit to a doctor after Plaintiff's
alleged onset date of February 2012 was not until October 2012
(see AR 278), and she failed to see her neurologist until
February 2013, a full year after the alleged onset date (see AR
287). Similarly, though she was recommended to "seek individual
neuropsychological therapies" (AR 344), no record indicates that
she ever did. Though she was twice prescribed medication for
fatigue, both times she initially refused to try it despite
concurrent complaints of debilitating fatigue. (Compare AR 280
(Aug. 2013: "[Plaintiff] was prescribed [a]mantadine, but ha[d]
not taken it"), and AR 330 (June 2015: "[Plaintiff] ha[d] been
reluctant to start [Ritalin] and ha[d] not tried [it]"), with AR
281 (Aug. 2013: positive for fatigue), and AR 352 (July 2015:
"[Plaintiff] report[ed] fatigue as a major problem").) She also
claimed that amantadine caused "major headaches" (AR 234), but
she complained to her doctor about headaches only once, blaming
them on her "pregnancy" and stating that "they [were not] so
severe that she need[ed] any other medication" (AR 326). In
March 2015, after her baby was born, she "denie[d] any neck pain
or headache[s]." (AR 327.)

---

[7] The Romberg Test is used to test balance. Romberg Test,
Physiopedia, https://www.physio-pedia.com/Romberg_Test (last
visited July 18, 2018).

17

Therefore, substantial evidence supports the ALJ's conclusion that Plaintiff's "treatment and examination history undermine[d her] allegations" (AR 26), and the ALJ appropriately considered that reason in his credibility assessment, see Rounds, 807 F.3d at 1006.

### 2. Activities of daily living

An ALJ may discount a claimant's subjective symptom testimony when it is inconsistent with her daily activities. See Molina, 674 F.3d at 1113. "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id. The ALJ found that Plaintiff's "activities tend[ed] to show that she ha[d] the ability to perform work." (AR 31.) He was correct.

Plaintiff claimed her fatigue was so disabling that she could follow instructions only for five to 10 minutes, sit for "30-45 min[utes]," stand a "max[imum of] 20 min[utes]," walk 10 to 15 minutes, and pay attention for an "hour" at a time. (AR 225.) In all of her symptom reports, Plaintiff regularly asserted that she needed to work "slowly," with "breaks" and even "naps." (See AR 218, 220, 224-25, 280.) Plaintiff also said that she "w[o]ke up slowly" and did chores "slowly . . . at [her] own pace." (AR 220.) She claimed that she "need[ed] [b]reaks" to "finish what [she] start[ed]." (AR 225.) She even noted that she napped "[t]wice or more a day" for "2-3 hours or more." (AR 218.) She said there were "[f]our to five days" a week she couldn't "get out of bed" (see AR 67-68), and "on a good day [it

18

was] still a struggle" (AR 68-69).

Yet she still admitted that she "read[]" (AR 224), "watch[ed] TV" (id.), "scrapbook[ed]" (id.), cared for her children (AR 68, 221, 224), shopped up to three times a week (AR 223), cooked daily (AR 66, 222) and as a hobby (AR 349), saw family "once a week" (AR 224), cleaned (AR 222), did laundry (id.), "brush[ed her] teeth" (AR 68), dressed (AR 68, 221), was independent in "personal care" (AR 221), drove (AR 54, 223), and handled money (AR 223-24). Just a few months before she stated as part of her disability application that she napped two or more times a day for two to three hours at a time (AR 218), she told Dr. Shubin that she slept well at night and didn't need to nap during the day (AR 284). Though she claimed she could stand for only 15 minutes and walk for only 10 before she was in pain (AR 218), she was able to cook for "15-30" minutes (AR 222) and even said it was her "hobby" (AR 349). She went grocery shopping one to three times a week for less than an hour, contradicting her claim that she could walk only 10 to 15 minutes before needing to "rest" for "20-25 min[utes]." (AR 223, 225.) Despite her alleged temporary blindness, she nonetheless drove everywhere she went and needed help only when she was "exhausted." (AR 223.) Finally, despite her allegedly debilitating fatigue, she reported no change in her "cooking habits" or "social activities" since her fatigue began. (AR 222, 225); see Ronquillo v. Colvin, No. CV 14-6702 JC, 2015 WL 5768348, at *7 (C.D. Cal. Sept. 30, 2015) (ALJ properly discounted plaintiff's credibility "because the alleged severity of his impairment was not consistent with [his] admitted level of activity," which included walking around block,

19

watching television, preparing meals, driving car, shopping in
stores, and "exercis[ing] 20 minutes 5 days per week at a
moderate or strenuous level").

Plaintiff also complained of attention and memory issues.
(See J. Stip. at 4-5; see also AR 66 (she would "try" to prepare
meals but would "forget"), 73-74 ("hard for [her] to retain
information" "because [she was] tired"), 75 (fatigue made it
"hard for [her] to focus on anything" she did), 225 (she could
pay attention for only "hour" at a time).) Yet she did not need
reminders to "take care of personal needs and groom[]" or to take
"medication." (AR 74, 222.) Although in 2015 she reported that
her husband took care of their finances (AR 349), in 2013
Plaintiff indicated that she had no issues with handling money
(see AR 223-24). Further, when she cooked she would "try to put
things together like [her] mom . . . used to" (AR 66) instead of
using packaged food, which would require less time and
concentration. She also still drove. (AR 54, 223); see Remmers
v. Colvin, No. CV-14-01028-PHX-JAT, 2015 WL 6502109, at *8 (D.
Ariz. Oct. 28, 2015) (Plaintiff's ability to, among other things,
"walk and care for her dogs on a daily basis," "grocery shop,"
"perform household chores," and "cook simple meals" showed that
she could "concentrate for sustained periods of time").

Plaintiff contends that even if her activities demonstrated
some ability to work, they were "[s]poradic" and "at [her] own
pace" and therefore not transferrable to a work place. (J. Stip.
at 9.) Her alleged need to work slowly and take naps, however,
was undermined by her daily activities. In October 2013 she said
she cared for her three-year-old daughter. (AR 220-21.) She

"fe[d] her, dress[ed] her, [and] bathe[d] her." (AR 221.)
Although she claimed her husband helped (AR 221), he also worked
"outside the home" (AR 53) and thus presumably was not available
much of the day. Her mother only "[s]ometimes" helped. (AR
221.) Indeed, though Plaintiff said her "mom" "primarily" cared
for her infant in March 2016, she admitted that the baby was
under her "exclusive care and control [for] three months" after
she gave birth, while she was "breast[ ]feeding" (AR 57), despite
contemporaneous complaints of fatigue and allegations of total
disability (see AR 327 (Mar. 2015: "[s]he is still nursing" and
"complains of fatigue and poor memory")). She did not say who
primarily cared for her five-year-old. Additionally, her mother
did not live with them and therefore presumably was not always
available. (See AR 220.)

        Taking care of young children or an infant in addition to
her numerous other daily activities would not allow Plaintiff to
go at her "own pace" (AR 220), nap "[t]wice or more a day" for
two to three hours "or more" (AR 218), or stay in bed all day for
four to five days a week (AR 67-68). See Rollins, 261 F.3d at
857 ("[Plaintiff's] claim to have totally disabling pain was
undermined by her own testimony about her daily activities, such
as attending to the needs of her two young children, cooking,
housekeeping, laundry, shopping, attending therapy and various
other meetings every week, and so forth."); Morrison v. Comm'r of
Soc. Sec., No. CV-14-08211-PCT-DGC, 2015 WL 1966654, at *5 (D.
Ariz. Apr. 30, 2015) ("A woman who can take care of her child,
enjoy various hobbies, and audition for a rock band is not likely
to be one who must spend most of her day in bed[.]").

Therefore, the ALJ appropriately considered the contradictions between Plaintiff's daily activities and her subjective symptom testimony.

### 3. ALJ's observations

The ALJ may consider his own observations at the hearing in assessing credibility. See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (ALJ's personal observations may be used in overall evaluation of credibility but cannot form "sole basis" for credibility determination); SSR 16–3p, 2016 WL 1119029, at *7 ("The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms[.]"); Thomas, 278 F.3d at 960 (ALJ properly relied on claimant's "demeanor at the hearing" in rejecting her credibility). The ALJ here rejected Plaintiff's testimony based on his observation that she "did not show any difficulty in focusing or concentrating when providing answers to questions or volunteering information[] at the hearing." (AR 31.)

Plaintiff argues that the observation was improper because "a 26-minute hearing laden with one-word answers does not evade the limitation on sit-and-squirm jurisprudence." (J. Stip. at 19 (citing Perminter v. Heckler, 765 F.2d 870 (9th Cir. 1985) (per curiam)).) Though Plaintiff is right that the ALJ's hearing observations may be of limited value, he did not err in noting them. In any event, he provided other clear and convincing reasons for discounting Plaintiff's subjective symptom testimony, as discussed above.

### 4. Conservative treatment

A conservative treatment history is a clear and convincing reason to reject a claimant's subjective symptom testimony. Parra, 481 F.3d at 751. The ALJ wrote that Plaintiff "was simply prescribed medication to control her symptoms" and that doctors didn't "adjust[] her medication in response to the . . . complaints regarding fatigue or medication side effects." (AR 31.) He also noted that "there [was] no evidence of [Plaintiff] being referred to specialists." (Id.) The ALJ likely erred in these findings.

First, his analysis was factually inaccurate. He was incorrect that Plaintiff was not referred to specialists. (See AR 31, 338.) The majority of the medical evidence in the record came from Dr. Shubin, a specialist in neurology, or his registered nurse practitioner.[8] (See AR 280-92, 316, 318, 323, 325-36.) Dr. Shubin further recommended her to clinical neuropsychologist Edge-Booth to address her "worsening fatigue." (AR 338.) Moreover, Dr. Shubin did adjust Plaintiff's medication. (AR 283, 329.) He first prescribed amantadine, a drug specifically used for fatigue in MS patients, in July 2013. (AR 283.) In May 2015, his nurse practitioner noted that she was "not able to tolerate it" and instead prescribed Ritalin.[9] (AR

---

[8] Dr. Shubin lists "[m]ultiple [s]clerosis" as one of his "[s]pecialties" on his website. See Specialties, Richard Shubin, M.D., http://www.richardshubin.com/gallery (last visited July 18, 2018).

[9] Plaintiff's treatment records do not address whether either prescription was effective, and there is little mention of
(continued...)

329, 370 (duplicate treatment note).)  Thus, the ALJ's findings
that "there [was] no evidence of [Plaintiff] being referred to
specialists" and that doctors didn't "adjust[] her medication in
response to [her] complaints" were incorrect.  (AR 31.)

Second, Plaintiff argues that her allegedly conservative
treatment was an unfair basis to reject her fatigue testimony
because it "rests on the unstated premise that there is some
other modality appropriate for multiple sclerosis."  (J. Stip. at
18.)  "A claimant cannot be discredited for failing to pursue
non-conservative treatment options where none exist."  Lapeirre-
Gutt v. Astrue, 382 F. App'x 662, 664 (9th Cir. 2010); see also
Matamoros v. Colvin, No. CV 13-3964-CW, 2014 WL 1682062, at *4
(C.D. Cal. Apr. 28, 2014) ("conservative treatment" insufficient
reason when "no indication" that "[p]laintiff's prescribed
treatment was a conservative method for treating [her
impairment]").  Courts have acknowledged that MS is a
degenerative disease with no cure and that treatment that might
otherwise seem conservative cannot be held to be such unless the
ALJ identifies specific alternative options.  See Rundell-
Princehouse v. Astrue, No. 10-988-CL, 2011 WL 7121604, at *5 (D.
Or. Oct. 31, 2011) (characterizing MS as "progressive and fatal
neurological disorder with limited available treatment and

---

[9] (...continued)
either one at all.  On a disability report, Plaintiff noted
"major headaches" as a side effect from the amantadine.  (AR
234.)  There is no other mention in the record of amantadine
causing headaches.  Plaintiff claims that she "could not
tolerate" Ritalin, either (J. Stip. at 5), but the record to
which she points as demonstrating that refers to amantadine, not
Ritalin (see id. (citing AR 370)).

without cure" and finding that "[i]t is unclear what treatment
the Commissioner would infer that [plaintiff] should have
utilized"); <u>Becerril v. Berryhill</u>, No. CV 16-1552 FFM, 2017 U.S.
Dist. LEXIS 204422, at *7-8 (C.D. Cal. Dec. 12, 2017) (describing
MS as "incurable" and finding that "without any evidence that any
non-routine, non-conservative treatment was available to
plaintiff, the ALJ was not permitted to discredit plaintiff
because she pu[r]sued only routine, conservative care"); <u>Jarrett
v. Berryhill</u>, No. CV 16-843 FFM, 2017 U.S. Dist. LEXIS 194437, at
*7 (C.D. Cal. Nov. 27, 2017) ("MS is not curable [and] is treated
primarily through medication used to manage the disease's
symptoms. . . .  Therefore, because it is not clear that other
treatment was available to plaintiff, the ALJ was not permitted
to discredit plaintiff for failure to seek 'non-conservative'
treatment.").

Here, the ALJ did identify a treatment Plaintiff could have
been prescribed, but only in his step-two analysis: he noted that
she was never prescribed "glasses or visual aids in response to
her vision problems." (AR 25; <u>see also</u> AR 63 (Plaintiff claiming
that her "eye would go blind"), 71 ("vision . . . blurred" "two"
to "five time[s] a month"), 91 ("off and on blindness of one
eye").)  Indeed, Plaintiff repeatedly denied vision problems to
her doctors and regularly had normal eye exams (<u>see, e.g.</u>, AR
281, 285, 287, 290-91, 326-27, 353) despite also claiming she had
blurred vision and sometimes went "blind" in one eye or the other
(AR 63, 91, 367-68).  And as the ALJ noted (AR 25), she did not
stop driving despite these alleged problems seeing, driving as
recently as the day before the hearing (AR 54).  All this

suggests that her vision problems were not as severe as she claimed, providing a basis to disbelieve her fatigue testimony, too. See Rounds, 807 F.3d at 1006 (in assessing particular testimony, ALJ may consider credibility of claimant's statements on other topics).

But even if the ALJ erred on this ground, he provided at least two other clear and convincing reasons for rejecting Plaintiff's subjective fatigue testimony, as discussed above; therefore, reversal is not warranted. See Larkins v. Colvin, 674 F. App'x 632, 633 (9th Cir. 2017) ("[B]ecause the ALJ gave specific, clear and convincing reasons for finding [plaintiff] not fully credible, any error in the additional reasons the ALJ provided for finding [her] not fully credible was harmless." (citing Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004))).

## VI.  CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[10] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: July 19, 2018_____          _Jen Rosenbluth_____
                                    JEAN ROSENBLUTH
                                    U.S. Magistrate Judge

---

[10] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."